# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00167-CV

**Margaret Pleasant and Mark Bowles d/b/a Prudential Synergy Realtors, Appellants**

**v.**

**Jason Bradford and Ashley Bradford, Appellees**

**FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
NO. 212,458-B, HONORABLE RICK MORRIS, JUDGE PRESIDING**

## O P I N I O N

This appeal involves a realtor's representation with respect to the square footage of improvements to a piece of residential real estate. The purchasers Jason and Ashley Bradford were awarded damages at trial on their fraud, negligent misrepresentation, and Deceptive Trade Practices Act claims based on an alleged overstatement by the realtor representing the sellers of the square footage of the home. On appeal, the sellers' realtor complains of (1) the jury finding that the Bradfords acted in reliance on the realtor's representation rather than on their own independent investigation; (2) the trial court's failure to submit a jury question on waiver of claims; and (3) the insufficiency of the evidence presented at trial to support the amount awarded by the jury under the benefit-of-the-bargain measure of damages. We affirm the judgment of the district court.

*Factual and Procedural Background*

Appellees Jason and Ashley Bradford, in early 2005, began shopping for their first home. Jason Bradford was graduating from medical school and believed that he would be accepted into the OB/GYN residency program at a hospital in Temple due to his existing relationships within the program. His wife, Ashley Bradford, had been a leasing agent for six months in 2002 during which time she had held a real estate license, but was now a stay-at-home mother of their three-month-old daughter. The Bradfords were looking for a house that would be affordable on the salary of a medical resident, that was located near the hospital in Temple because at times Jason would need to be on-call, and that was priced below-market so that they might make money on the house in the event that they left Temple at the end of Jason's four-year residency.

After viewing "around ten" houses for sale, the Bradfords were informed by their realtor on January 25, 2005, of a house just placed on the market that appeared to match the Bradfords' search criteria. The house was owned by John and Beatrice Vasquez, who had hired appellant Margaret Pleasant as their real estate agent to sell their house. Pleasant had received her real estate license in 2004 and been hired as an independent contractor by appellant Mark Bowles d/b/a Prudential Synergy Realtors, a real estate broker with offices in Temple, Waco, and Killeen.

Pleasant had listed the Vasquez home on the Multiple Listing Service ("MLS") on January 24. An MLS listing contains a variety of information about a house and notifies fellow realtors that the house is for sale. Pleasant represented on the MLS listing that the "approximate heating area" of the Vasquez home was 1,824 square feet, which figure she obtained from the Bell County Appraisal District ("Bell CAD"). This figure turned out to be incorrect. With

the asking price entered at $119,500, the MLS automatically calculated and listed the price per square foot at $65.52. The source for a house's square footage information was not a required field on the MLS listing, although other realtors (along with Pleasant herself) testified at trial that it was their standard practice to identify the source on a listing. The source for the Vasquez home's square footage was not included on the listing. Pleasant attributed this omission to a clerical error by a secretary in the Temple office—an employee of Mark Bowles—who did the actual entry into the MLS system of the information prepared by Pleasant.

There was a factual dispute at trial as to how the Bradfords received a copy of the MLS listing. According to the Bradfords, there were several copies of the listing sheet inside the house with a stack of Pleasant's business cards during their visits to the house the afternoon of January 25. According to Pleasant, she had removed all such copies from the house after the 11 a.m. open house for realtors on January 25. At trial, appellants pointed to the fact that the MLS listing page entered into evidence by the Bradfords stated "01/25/2005 04:00PM" in its footer as evidence that the page came not from Pleasant's open house but from the Bradfords' realtor, Angela Bruce, who testified she "would bet" she did give the Bradfords the sheet since it is her practice to give her clients all the data sheets of a prospective house for her clients. Regardless of how they obtained the MLS listing print-out for the Vasquez home, the Bradfords testified they were drawn to the listing's price per square foot because all the other houses they had viewed were priced between $75 and $80 per square foot. The Bradfords attributed the lower price per square foot to the sellers' immediate need to sell the house (John Vasquez had unexpectedly become unemployed) and to the condition

3

of the home, which included rotting wood on a supporting column in the front, stained carpets, the lack of a privacy fence in the back, and the lack of a garage door opener.

After viewing the Vasquez home, the Bradfords signed a form provided by their realtor Angela Bruce that stated the following:

> The Buyer is advised to verify all information important to him/her and to ask the appropriate questions of the appropriate authorities himself/herself or through an attorney with respect to important issues such as . . . size of structure . . . . Any statements with respect to problems or with respect to the availability or existence of any of these items which were made by the REALTOR and his/her associates were made based on information given to the REALTOR by the Seller/Owner and/or government agencies, and/or others, and there is no intention that the Buyer rely on the statements of the REALTOR and his/her associates, and the Buyer is urged to confirm any such statements on his/her own.

> Having read the foregoing disclaimer, I/we, the prospective Buyer(s), by my/our signature(s) below, state that I/we have not relied upon any statement given to me/us by the REALTOR and/or his/her associates with regard to the property, and my/our decision to make an offer on the property and to subsequently purchase the property is based on my/our independent decision with or without legal counsel.

At some point after the Bradfords signed the form on the signature lines marked "Buyer," the Vasquezes signed the same form on the signature lines marked "Seller."

After viewing the Vasquez home, Jason Bradford went on the Bell CAD website and observed that the square footage for the home was listed at 1,824 square feet, the same amount as on the MLS listing. He testified that his reason for going on the website was to check the property tax amount on the property and not to confirm the square footage.

Shortly thereafter, the Bradfords made an offer on the house in the amount of $118,000, which the Vasquezes accepted. The sales price was subsequently raised to $119,200, to

4

account for an additional $1,200 for repairs on the house. Because Jason's residency would not be confirmed until March, the closing date was set at April 1, 2005. However, the Bradfords moved into the house in late February, paying the Vasquezes' March mortgage payment as rent. During that time period, the Bradfords began making improvements to the house, including painting the interior walls and replacing the flooring in the kitchen and master bathroom.

At the closing on April 1, the Bradfords learned that an appraisal had been done on the house at the request of the lender bank and that they had the right to receive a copy. They requested a copy of the lender's appraisal and within five days after the closing they received their copy of the appraisal, which listed the house's living area at 1,571 square feet. This measurement was 253 square feet less than that represented by the MLS listing, resulting in a price per square foot of $76.07 rather than $65.52. The Bradfords contacted a lawyer and filed suit against appellants in district court on August 25, 2005.[1]

The matter was tried to a jury in December 2006. The jury found that Pleasant acted as an agent of Mark Bowles, that the square footage representation in the MLS listing constituted fraud, negligent misrepresentation, and a false, misleading, or deceptive act or practice under the Deceptive Trade Practices Act ("DTPA") by both appellants, that the difference between the value of the house as it had been represented and the value of the house as received was $2,621.08, and that the difference between the purchase price and the value of the house as received was $5,000. The district court awarded the Bradfords $2,621.08 in damages, plus attorneys' fees, interest, and

---

[1] The Vasquezes were also included as defendants, but the Bradfords nonsuited their claims against the Vasquezes shortly before trial.

5

costs. On appeal, appellants raise the following issues: (1) there was legally and factually insufficient evidence to support the jury finding that the Bradfords relied on the MLS listing's representation of square footage; (2) the court improperly refused to submit a jury question on appellants' affirmative defense of waiver; (3) for the damages award of $2,621.08, there was no evidence at trial of the value as represented; and (4) such damages award was an arbitrary amount with no support in the evidence.[2]

### *Reliance on the Misrepresentation*

Appellants' first point on appeal is that there is legally and factually insufficient evidence to support the jury finding that the Bradfords relied on appellants' representation of the Vasquez home's square footage. In reviewing a legal sufficiency challenge, we review the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). We will sustain appellants' complaint if the record reveals: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *See id.* at 810. More than a scintilla of evidence exists if the evidence rises

---

[2] Appellants also presented a fifth issue on appeal—that the trial court's award to the Bradfords of attorneys' fees for an appeal by appellants to this Court should have been conditioned on the Bradfords' success in the appeal. Because we affirm the judgment of the trial court on all other issues, and thus the Bradfords are successful in this appeal, we need not address appellants' argument on the attorneys' fees issue.

to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

In reviewing a factual sufficiency challenge, we must consider and weigh all the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). We set aside the verdict for factual insufficiency only if the evidence that supports the jury's finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Both Jason and Ashley Bradford testified that they had relied on the MLS representation of square footage in purchasing the home. Jason testified that in his search for "a great deal" he depended on a house's price per square foot and, specifically in regard to the Vasquez home, he relied on the MLS listing for the price per square foot. He further stated that the price per square foot was his "biggest concern." Likewise, Ashley testified that the low price per square foot of the Vasquez home, as represented on the MLS listing, was important to her and was "the overriding factor" in her decision to go through with the purchase of the house.

Despite the Bradfords' testimony regarding reliance, appellants assert that the evidence of reliance was legally and factually insufficient due to the following conduct by the Bradford: (1) they verified with their realtor that appellants' source for the home's square footage was the Bell CAD, visited the Bell CAD's website, confirmed the square footage on the website, and relied on that source of information; (2) they lived in the home for over 30 days before closing, during which time they made repairs and had the opportunity to inspect any aspect of the house; and

7

(3) they signed a form provided by their realtor in which they disclaimed any reliance on statements given by "the REALTOR."

As appellants assert on appeal, Angela Bruce referred the Bradfords to the Bell CAD website, and Jason Bradford accessed the website and observed that the square footage figure was identical to the amount provided by appellants in the MLS listing. Furthermore, on cross examination Ashley Bradford admitted that she relied on the Bell CAD's square footage amount. This admission was coupled, however, with her testimony that her reliance on the Bell CAD website was no greater than her reliance on the MLS listing. We are, therefore, faced with the question of whether a subsequent source for a misrepresentation precludes reliance on the initial source for the misrepresentation.

Appellants rely on *Bartlett v. Schmidt*, 33 S.W.3d 35 (Tex. App.—Corpus Christi 2000, pet. denied), to argue that a subsequent source for a misrepresentation will negate reliance on an earlier source. In *Bartlett*, a seller of real estate knowingly misrepresented to a buyer that a property had no restrictions on commercial use when in fact it was restricted to residential use only. *See* 33 S.W.3d at 36-37. The buyer obtained the same misinformation from the title company and then confirmed his understanding of the lack of restrictions with his attorney. *See id.* at 37. After buying the property and commencing construction for a shipbuilding enterprise, the buyer learned of the existing restrictions on the property. *See id.* The court held that the buyer could not recover for either fraud or negligent misrepresentation because reliance on representations is not present where the plaintiff "conducts an independent investigation into the matters covered by the representations, which is sufficient to inform him of the truth, and which is not interfered with or

8

rendered nugatory by any act of any other party."[3]  *Id.* at 38 (quoting *Marcus v. Kinabrew*, 438 S.W.2d 431, 432 (Tex. Civ. App.—Tyler 1969, no writ)).

The Bradfords argue that the independent-investigation rule applied in *Bartlett* is inapplicable here because Jason Bradford's viewing of the Bell CAD's website did not "inform him of the truth." We agree that the rule does not apply, but not for this reason.[4]  According to the court

---

[3]  The court in *Bartlett* held that the buyer could not recover for fraud or negligent misrepresentation "as a matter of law." *Bartlett v. Schmidt*, 38 S.W.3d 35, 38 (Tex. App.—Corpus Christi 2000, pet. denied).  Of course, the court was not stating that *any* evidence of an investigation defeats an allegation of reliance, but rather that there was legally sufficient evidence of an unimpaired investigation by the buyer sufficient to show a lack of reliance on the seller's representations.

[4]  A buyer's investigation that reveals the falsity of a seller's statement can negate subsequent reliance on the statement.  *See, e.g.*, *Camden Mach. & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 310-11 (Tex. App.—Fort Worth 1993, no writ).  *Bartlett* stands for the proposition, however, that an investigation that does *not* uncover the truth can also negate reliance on the statement.  *See Bartlett*, 33 S.W.3d at 38 ("[R]egardless of the result of his investigation, the buyer's decision to undertake such an investigation indicates that he . . . is not relying on the seller's representations about the property.").  It seems, then, that under *Bartlett* the phrase "which is sufficient to inform him of the truth" describes the scope of the investigation rather than its effectiveness.  We express no opinion whether the Bradfords' accessing the Bell CAD website in order to check the house's square footage would have been an investigation sufficient in scope to negate the element of reliance because we find sufficient evidence that the Bradfords did not conduct such an investigation.

The Bradfords also argue that *Bartlett* is "out of line with Texas law."  In *Warehouse Associates Corporate Centre II, Inc. v. Celotex Corp.*, 192 S.W.3d 225, 244-45 (Tex. App.—Houston [14th Dist.] 2006, pet. filed), the Fourteenth Court of Appeals held that *Bartlett* was contrary to the Texas Supreme Court's opinion in *Prudential Insurance Co. v. Jefferson Associates*, 896 S.W.2d 156 (Tex. 1995).  In *Prudential*, the court held that an "as is" agreement in an arms-length transaction negates the causation element in a fraud or DTPA claim by the buyer unless the seller impaired the buyer's inspection or the "as is" agreement itself was induced by fraudulent representation or concealment.  *See* 896 S.W.2d at 160-62.  We need not address the *Warehouse Associates* holding because we determine there was sufficient evidence that the rule in *Bartlett* did not apply to the Bradfords' actions.  Therefore, we decline to consider whether, given *Prudential*, a seller could avail himself of *both* the defense of the buyer's independent investigation and the defense of the buyer having assented to an "as is" agreement, or whether a buyer's independent investigation of a statement could demonstrate the buyer's lack of reliance on that statement in entering into an "as is" agreement.

in *Bartlett*, a person's independent investigation of information can defeat an assertion of reliance because the very decision to undertake an investigation can indicate that the person is not relying on the information. *See id.* at 38 ("[R]egardless of the result of his investigation, the buyer's decision to undertake such an investigation indicates that he . . . is not relying on the seller's representations about the property.").

Contrary to appellants' assertion that the Bradfords verified with their realtor the source of the MLS representation of square footage, Jason Bradford testified that Angela Bruce's referral to the Bell CAD website was not related to the square footage, but was in response to his asking what else might be wrong with the house. According to his testimony, his concern was that the low price was an indication of problems with the house. Although appellants claim that Angela Bruce testified she "did, in fact, verify the source of the square footage for the Bradfords," her actual testimony was equivocal. Specifically, she stated that she "probably" went on the Bell CAD website to confirm the square footage and that she did not remember whether she had given Jason Bradford a printed copy from the website but "would have done it if he had asked me." The only other witness on this subject, Ashley Bradford, testified simply that she never asked Angela Bruce to ascertain the source of the MLS representation of square footage.

Jason Bradford further testified that his subsequent access of the Bell CAD website was not for the purpose of confirming the house's square footage. Rather, he claimed that he accessed the website to learn the property tax amount on the house, and his viewing of the square footage on the website was merely incidental to such purpose. Regardless of the vitality of the holding in *Bartlett*, this was not an "independent investigation" as contemplated by *Bartlett*.

10

Therefore, taking Jason's testimony as true, neither his viewing of the Bell CAD website nor Ashley's professed partial reliance on that source would negate their continued reliance on the MLS listing.

In order to negate the element of reliance, appellants next refer to the fact that the Bradfords lived in the home for over thirty days before the closing, during which time they made repairs and had the opportunity to inspect the square footage of the house. First, we note that the Bradfords' residence in the house prior to closing does not demonstrate an "independent investigation" as described in *Bartlett*. Appellants do not argue, and no evidence was presented at trial, that during the time of such residence the Bradfords measured the house or conducted any other investigation of the square footage. Instead, appellants' position appears to be that there was *opportunity* for an independent investigation. As we have discussed, it is actually conducting an independent investigation that can indicate the absence of reliance under *Bartlett*. *See id.* The mere opportunity to conduct an investigation, without evidence that opportunity resulted in an actual investigation, is insufficient for the rationale of *Bartlett* to apply. The opportunity to conduct an independent investigation of a representation, without more, may be relevant to whether reliance on that representation was reasonable. *See Ortiz v. Collins*, 203 S.W.3d 414, 421 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (reliance must be "reasonable and justified" under fraud and negligent misrepresentation claims). However, such an opportunity, by itself, does not negate reliance.

Appellants seem to imply that the Bradfords' residence and repairs in the home impair the reasonableness of their continued reliance on the MLS listing as of the closing. As to the Bradfords' residence, appellants focused on Ashley Bradford having had a real estate license in 2002

11

and suggest that this implies special expertise to determine the square footage of a house. However, appellants' own expert appraiser conceded that it was "kind of hard to tell" a house's square footage, that he could "hit it within, you know, I mean probably 4- or 500 feet real easy," and that a house appearing to contain 2,000 square feet might actually contain only 1,700 square feet. As to the repairs, prior to the closing the Bradfords purchased tile and hired someone to install it in the kitchen and master bathroom. However, there was no indication that prior to the closing the Bradfords measured or replaced the flooring anywhere else in the house.

Appellants also argue that the disclaimer form signed by the Bradfords for their realtor negates reliance in their circumstances. The form advises the Bradfords to verify information that they consider important, including the home's size, disclaims any reliance by the Bradfords on statements by "the REALTOR," and declares the home purchase to be the Bradfords' "independent decision." Although the form does not define the term "REALTOR," appellants insist that the term includes both the buyer's realtor (Angela Bruce) and the seller's realtor (appellants), because the form contained signature lines for both buyers and sellers and the Vasquezes signed the form on the sellers' signature lines. According to Jason and Ashley Bradford's testimony, however, at the time they signed the form, it did not yet contain the Vasquezes' signatures. Furthermore, Jason Bradford testified that his understanding in signing the form, which was on Angela Bruce's real estate company letterhead, was that "REALTOR" referred only to his own realtor, not to appellants. Ashley Bradford testified to the same understanding and added that before signing the form they had sought explanation from Angela Bruce, who clarified to them that the form referred specifically to Angela Bruce and her real estate company but not to Margaret Pleasant and her real estate company.

12

In reviewing all the evidence, we find that the jury could reasonably conclude that the Bradfords' intention in obtaining information from their realtor and in accessing and viewing the Bell CAD website was for purposes other than investigating the home's square footage, that the Bradfords' residence and repairs in the home prior to closing was insufficient to inform them of the home's actual square footage or alert them to a reason to conduct an investigation, and that the Bradfords' disclaimer of reliance applied to their realtor's statements but not to appellants' statements. More than a scintilla of evidence exists to support the jury's finding of reliance, and such finding is not so contrary to the overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust. *See Ford Motor Co.*, 135 S.W.3d at 601 (legal sufficiency); *Cain*, 709 S.W.2d at 176 (factual sufficiency). We, therefore, hold that the evidence was legally and factually sufficient for the jury to conclude that the Bradfords relied on the MLS listing's representation of the Vasquez home's square footage.

### *Jury Question Regarding Waiver*

Appellants' next point on appeal is that the trial court erred by failing to submit an issue on waiver to the jury based on the disclaimer form. Texas rules of civil procedure require a trial court to submit to the jury questions raised by the written pleadings and the evidence. Tex. R. Civ. P. 278. Appellants raised the affirmative defense of waiver in their pleadings and presented a written question on waiver during the charge conference, which was refused by the trial court.[5] "So long as matters are timely raised and properly requested as part of a trial court's charge,

---

[5] Appellants presented the following written question: "Do you find that the Bradfords waived reliance upon any representation made by Defendants regarding the square footage of the home? Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right. Answer 'Yes' or 'No.'"

13

a judgment cannot be permitted to stand when a party is denied proper submission of a . . . vital defensive issue raised by the pleadings and evidence." *Exxon Corp. v. Perez*, 842 S.W.2d 629, 631 (Tex. 1992). A trial court may refuse to submit an issue only if no evidence exists to warrant its submission. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992).

Waiver is an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right. *Sun Exploration & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). A waivable right may spring from law or from contract. *Tenneco Inc. v. Enterprise Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996).

Appellants argue that the form signed by the Bradfords, which disclaimed reliance on any statements by "the REALTOR," was a written waiver of reliance. However, none of the cases cited by appellants stands for the proposition that reliance is a known right, springing from law or from contract, that may be waived. *See In re General Elec. Capital Corp.*, 203 S.W.3d 314 (Tex. 2006) (waiver of contractual right to non-jury trial); *Jernigan v. Langley*, 111 S.W.3d 153 (Tex. 2003) (waiver of statutory right to seek dismissal of lawsuit); *Sun Exploration*, 728 S.W.2d at 37 (waiver of condition precedent to contract). A written waiver of a party's causes of action can support an affirmative defense of waiver against a fraud claim. *See Roberts v. Whitfill*, 191 S.W.3d 348, 358-59 (Tex. App.—Waco 2006, no pet.) (trial court erred in refusing to submit jury question on defendant's affirmative defense of waiver where a settlement agreement provision waived all causes of action). A DTPA claim may also be waived, although there are specific statutory requirements for the waiver to be valid and enforceable. *See* Tex. Bus. & Com. Code Ann. § 17.42 (West 2002). However, we find no evidence in the record that the Bradfords waived their right to

14

sue appellants or their right to assert a fraud, misrepresentation, or DTPA claim. To the extent the Bradfords disclaimed reliance on any statements by appellants, they did not relinquish any right to assert their causes of action. Rather, the disclaimer of reliance, if effective against appellants, could "conclusively negate the *element* of reliance" in the Bradfords' causes of action. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179-81 (Tex. 1997) (emphasis added); *see Ortiz*, 203 S.W.3d at 421 (reliance is element of fraud and negligent misrepresentation claims); Tex. Bus. & Com. Code Ann. § 17.50(a)(1) (West Supp. 2007) (reliance is element of the Bradfords' DTPA claim). Such a form does not act as a waiver of reliance.

Appellants' submitted question regarding waiver essentially acted as an inferential rebuttal. An inferential rebuttal question seeks to disprove the existence of an essential element submitted in another question. *Select Ins. Co. v. Boucher*, 561 S.W.2d 474, 477 (Tex. 1978); *In re Nance*, 143 S.W.3d 506, 513 n.7 (Tex. App.—Austin 2004, no pet.) ("Inferential rebuttal issues attempt to disprove a claim by establishing the truth of a positive factual theory that is inconsistent with some factual element of the ground of recovery."). That is precisely what appellants sought to accomplish with their waiver question. Appellants' theory of waiver was an attempt to negate the Bradfords' reliance, which was included as an element in each of the jury questions for the Bradfords' claims of fraud, misrepresentation, and violation of the DTPA. According to the Texas rules of civil procedure: "Inferential rebuttal questions shall not be submitted in the charge." Tex. R. Civ. P. 277. Appellants' submitted question regarding waiver was an inferential rebuttal question. Consequently, it was prohibited by Texas Rule of Civil Procedure 277.

15

It is worth noting that appellants do not complain of the trial judge's refusal to submit a jury *instruction* that would have informed the jury of the disclaimer form's impact on the element of reliance in each of the Bradfords' claims, in the event the jury determined that the term "REALTOR" encompassed Pleasant and her real estate company. *See City of Houston v. Levingston*, 221 S.W.3d 204, 237-38 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (finding jury instruction rather than separate jury question to be proper where the defense acted to negate the causation element of the plaintiff's cause of action); *Columbia Rio Grande Reg'l Healthcare, L.P. v. Hawley*, 188 S.W.3d 838, 859 (Tex. App.—Corpus Christi 2006, pet. granted) (new and independent cause, which can negate the causation element in a negligence claim, "is an inferential rebuttal defense that may be submitted to the jury as an instruction but not as a special issue"); *Mayes v. Stewart*, 11 S.W.3d 440, 455 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (discussing a proposed jury instruction on a factual issue by which defendant sought to negate the element of reliance in a fraud claim); *Weitzul Constr., Inc. v. Outdoor Environs*, 849 S.W.2d 359, 365 (Tex. App.—Dallas 1993, writ denied) ("The proper method to submit an inferential rebuttal issue is by instruction, not by question."). Instead, appellants submitted a proposed jury question, which was an improper inferential rebuttal question. Therefore, the trial court's exclusion of appellants' question on waiver from the jury charge was proper.[6]

---

[6] Appellants also argue that the Bradfords' conduct other than signing the disclaimer—verifying with their realtor that the source for the home's square footage was the Bell CAD, observing the square footage misinformation on the Bell CAD website and relying on that source of information, and living in the home for over 30 days before closing—was inconsistent with "claiming a right of reliance" and warranted submission to the jury of their question based on implied waiver. *See Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) ("[F]or implied waiver to be found through a party's actions, intent must be clearly demonstrated by the surrounding facts and circumstances."). We reject this argument for the same reason that we reject appellants' argument concerning the disclaimer form—appellants' jury question was an improper inferential rebuttal question.

*Benefit-of-the-Bargain Damages*

Appellants' remaining points on appeal relate to the amount awarded by the jury under the benefit-of-the-bargain measure of damages.

Appellants assert that the Bradfords failed to introduce any evidence of the value of the house as represented. The jury awarded the Bradfords $2,621.08 in "benefit-of-the-bargain" damages. Benefit-of-the-bargain damages are the difference, at the time of the sale, between the value as represented (the value of the house if it had contained 1,824 square feet) and the value as received (the value of the house given its actual square footage). *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997). Appellants do not dispute that evidence of the value as received was introduced: the Bradfords' expert appraised the home at $111,000 (after two earlier appraisals of $114,500 and $117,000), the appraisal that alerted the Bradfords to the square footage misrepresentation gave the home a value of $119,500, and appellants' expert appraised the home at $122,500. However, the Bradfords never introduced a specific appraised value of the house that assumed it did in fact contain 1,824 square feet.

The Fort Worth Court of Appeals was faced with a similar situation in *Matheus v. Sasser*, 164 S.W.3d 453 (Tex. App.—Fort Worth 2005, no pet.). In *Matheus*, the plaintiff purchased a home in reliance on an MLS listing sheet stating the house had 4,218 square feet. *See* 164 S.W.3d at 456-57. However, the seller's real estate agents had overstated the square footage by 625 square feet, which the plaintiff learned after the closing from the appraisal performed at the request of his mortgage company. *See id.* The court of appeals held that, unlike here, the plaintiff failed to produce evidence on the value of the house as received, but prior to reaching this holding,

17

the court addressed the realtors' argument that the plaintiff failed to offer any evidence on the value as represented. *See id.* at 462-63. The court disagreed with the realtors, concluding that the "price agreed on by the parties is evidence of the property's fair market value as represented." *Id.* at 462. We also conclude that the purchase price agreed to by the Bradfords and appellants, at a time when both parties believed the house contained 1,824 square feet, is evidence of the house's value as represented. *See Ford Motor Co. v. Cooper*, 125 S.W.3d 794, 799 (Tex. App.—Texarkana 2004, no pet.); *Barraza v. Koliba*, 933 S.W.2d 164, 169 (Tex. App.—San Antonio 1996, writ denied); *Chrysler Corp. v. Schuenemann*, 618 S.W.2d 799, 805 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). The Bradfords presented undisputed evidence of both the agreed price of $118,000 and the subsequent increase to $119,200 in order to cover initial repairs. Therefore, we find that the Bradfords introduced legally sufficient evidence on the value of the home as represented.

Appellants' real problem with the damage evidence is not that there was not evidence of the value as represented. Rather, it is that the jury did not adhere to that evidence and, thus, that the damages award is not supported by the evidence. In addition to the jury question on benefit-of-the-bargain damages, the court submitted a jury question on "out-of-pocket" damages, which are the difference at the time of the sale between the value *the buyer paid* and the value as received. *See Arthur Andersen*, 945 S.W.2d at 817. Because the jury's answer of $5,000 is not identical to its benefit-of-the-bargain award of $2,621.08, it is apparent that the jury did not, in fact, conclude that the value as represented equaled the purchase price. Given this fact, and the specificity of the damages figure with no readily apparent source from the record, appellants assert that the jury's award of damages under the benefit-of-the-bargain measure of damages was arbitrary.

18

The legal sufficiency test is inapplicable here. We have previously held that "evidence corresponding to the precise amount found by the jury is not essential" in order to withstand a legal-sufficiency challenge. *Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 695 (Tex. App.—Austin 1989, no writ). As we have already concluded that the Bradfords introduced some evidence of both the value as represented and the value as received, appellants must rely on a factual-sufficiency challenge in order to successfully attack the jury award for benefit-of-the-bargain damages. *See id.*

So long as a rational basis for the calculation of damages exists, a jury's finding will not be disregarded merely because its reasoning in arriving at its figure may be unclear. *McMillin v. State Farm Lloyds*, 180 S.W.3d 183, 201-02 (Tex. App.—Austin 2005, pet. denied). Conversely, a jury cannot arbitrarily award an amount neither authorized nor supported by the evidence presented at trial. *Mills v. Jackson*, 711 S.W.2d 427, 434 (Tex. App.—Fort Worth 1986, no writ). Appellants rely on our opinion in *First State Bank v. Keilman*, 851 S.W.2d 914 (Tex. App.—Austin 1993, writ denied), to argue that the jury's award was arbitrary. In *Keilman*, in connection with a usury claim, the opposing parties provided conflicting methods for calculating the amount of unauthorized interest. *See* 851 S.W.2d at 929-30. The debtor claimed that the entire sum of $12,669.92 in a demand letter was interest, $7,161.44 of which was unauthorized ($5,508.48 was past due). The lender introduced evidence that the $12,669.92 figure consisted of $12,500 in principal and $169.92 in interest, none of which was unauthorized. *See id.* at 930. The jury found an amount in between those figures—$360. We concluded that the jury "pulled its answer out of a hat," and therefore, the evidence was factually insufficient to support the jury's finding. *Id.* at 931.

19

Central to our conclusion in *Keilman* was the fact that the "evidence presented by both the [parties] provided a relatively precise method for calculating unauthorized interest." *Id.* We have distinguished *Keilman* in subsequent opinions where the evidence supports a range of damage options rather than an either-or situation. *See McMillin*, 180 S.W.3d at 202-03; *Mayberry v. Texas Dep't of Agric.*, 948 S.W.2d 312, 317 (Tex. App.—Austin 1997, writ denied). Other courts have done the same. *See Formosa Plastics Corp. v. Kajima Int'l, Inc.*, 216 S.W.3d 436, 454-55 (Tex. App.—Corpus Christi 2006, pet. denied); *City of Houston v. Harris County Outdoor Adver. Ass'n*, 879 S.W.2d 322, 335 n.5 (Tex. App.—Houston [14th Dist.] 1994, writ denied). Thus, while appellants are correct that a jury award is not per se rational simply because it falls in between the figures presented by expert testimony, neither is a damages award per se arbitrary because it does not match up precisely with figures presented in expert testimony. *See Parallax Corp. v. City of El Paso*, 910 S.W.2d 86, 91-92 (Tex. App.—El Paso 1995, writ denied) (jury can depart from expert valuations if other evidence presented at trial is sufficient for the jury to do so).

This was not a case in which there were only certain figures that the jury could select in making the damages award. The jury heard five different appraisals for the value of the home as received: $111,000, $114,500, $117,000, $119,500, and $122,500. The jury also heard two different purchase prices, which were evidence of the value of the home as represented: the accepted offer of $118,000 and the final contract price of $119,200. In addition, the jury may have determined or adjusted its award based on square footage valuations. The jury was presented with different amounts of the square footage of the home as received: 1,567 square feet according to the Bradfords' expert witness's appraisal, 1,571 square feet according to the lender bank's pre-closing

20

appraisal, and 1,597 square feet according to appellants' expert witness's appraisal. This enabled three different starting points for a comparison between the house as received and the house with its represented 1,824 square feet. The jury was also presented with two separate dollar-per-square-foot adjustment amounts used by the expert witnesses in appraising the Vasquez home based on sales of homes with higher or lower square footage amounts. The Bradfords' expert witness testified to an adjustment of $46.67 per square foot, whereas appellants' expert witness used an adjustment of only $20 per square foot.[7] Finally, we note that the jury may have taken into consideration the price-per-square-foot amounts of the Vasquez home and comparable houses sold in the area. The MLS listing offered the Vasquez house at a price per square foot of $65.52. The Bradfords testified that the other houses they had looked at had prices per square foot in the $75 to $80 range. Altogether, the five

---

[7] Appellants point out that these adjustment values were presented to the jury solely for purposes of the expert witnesses explaining or defending their appraisals. However, just as we concluded that the home's purchase price was evidence of the home's value as represented even if no testimony actually identified it as such, we consider the experts' home appraisal adjustments based on square footage differences to be evidence applicable to benefit-of-the-bargain damages even if no testimony identified them as such. In this regard, we note that the Bradfords' counsel during closing argument asked the jury to use the $46.67 figure to determine the benefit-of-the-bargain damages.

Also, we recognize that the Fort Worth Court of Appeals in *Matheus* held that it was improper to determine benefit-of-the-bargain damages for a home sale—where price is not negotiated on a per-unit basis—by multiplying the price per square foot as represented (the purchase price divided by the misrepresented square footage) by the difference between the square footage as represented and the square footage as received. *See Matheus v. Sasser*, 164 S.W.3d 453, 460-62 (Tex. App.—Fort Worth 2005, no pet.). We do not consider *Matheus*'s holding to be applicable to the figures we are citing because, rather than the represented price per square foot from the home purchase, we refer to an appraiser's price-per-square-foot adjustment, which is *intended* to be used to adjust home values based on differences in square footage.

appraisals of the Vasquez home entered into evidence used ten comparable home sales, each with separate prices per square foot ranging from $69.48 to $82.45.

Based on all of the above evidence, we find that this was not a case in which the jury only had distinct damages figures to choose from or in which there were no variables involved in applying a predetermined formula. *See Mayberry*, 948 S.W.2d at 317. The evidence presented the jury with a range of possible reasonable values. $2,621.08 was within the range of damage amounts supported by the evidence. *See Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002) ("In determining damages, the jury has discretion to award damages within the range of evidence presented at trial."). The evidence was legally and factually sufficient to support the jury's finding of $2,621.08 for benefit-of-the-bargain damages.

### Conclusion

We hold that the trial court's refusal to submit a question to the jury on the issue of waiver was proper. We also hold that the evidence was legally and factually sufficient to support the jury's findings on the element of reliance and on the amount of benefit-of-the-bargain damages owed to the Bradfords by appellants. We affirm the judgment of the district court.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed

Filed:   June 26, 2008